1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   WALTER ZELHOFER,                      No. 2:16-cv-00773-TLN-AC

12            Plaintiff,

13        v.                               **ORDER**

14   METROPOLITAN LIFE INSURANCE
     COMPANY and TECHNICOLOR USA,
15   INC.,

16            Defendants.

17

18        Plaintiff Walter Zelhofer ("Plaintiff") was an engineer for Thomson, Inc.[1] who had a

19   coronary artery stent placement and heart-related procedures in September 2009 and subsequently

20   experienced anxiety, depression, and related psychological complaints he attributed to his cardiac

21   problems.  In February 2010, Plaintiff applied for long-term disability benefits available through

22   his employer's insurer, Defendant Metropolitan Life Insurance Company ("MetLife").  MetLife

23   initially approved Plaintiff's claim and paid benefits for almost two years until MetLife

24   determined in March 2012 that Plaintiff was no longer disabled under the terms of the Plan.

25   Plaintiff subsequently appealed MetLife's determination in June 2012, and MetLife upheld its

26

27   _____
     [1]       Thomson, Inc. became Technicolor USA, Inc. (one of the named Defendants in this case)
28   following a corporate reorganization.  (ECF No. 49 at 6–7.)

                                    1

termination of benefits in October 2012.  Plaintiff brought this action against MetLife and his employer Defendant Technicolor USA, Inc. ("Technicolor") (collectively, "Defendants") pursuant to the Employment Retirement Income Security Act ("ERISA").  This matter is before the Court on the parties' Cross-Motions for Judgment under Federal Rule of Civil Procedure ("Rule") 52.[2]  (ECF Nos. 115, 125.)  Both motions are fully briefed.  (ECF Nos. 128, 130, 133, 134.)  Also before the Court is Plaintiff's Motion for Admission of Extrinsic Evidence.  (ECF No. 119.)  This motion is also fully briefed.  (ECF Nos. 129, 132.)  The Court has carefully considered the parties' arguments and hereby finds, for the reasons set forth below, that Plaintiff's Motion for Judgment is DENIED, Defendants' Motion for Judgment is GRANTED, and Plaintiff's Motion for Admission of Extrinsic Evidence is DENIED.

## I.      FINDINGS OF FACT[3]

### A.      Pertinent Plan Provisions

1.      LTD Benefits: Plaintiff was a participant in the Thomson Inc. Long Term Disability ("LTD") Plan (the "Plan"), an employee welfare benefit plan established and maintained by Technicolor.  (AR 631[4]; ECF No. 49 at 7.)  The Plan's LTD benefits are funded by a group insurance certificate issued to Thomson Inc. by MetLife, which also is the LTD claim administrator for the Plan.[5]  (AR 1078–1122.)

---

[2]      Defendants correctly note that Plaintiff cites the legal standard for summary judgment pursuant to Rule 56.  (ECF No. 130 at 4.)  Defendants contend that to the extent Plaintiff seeks summary judgment, the request is improper and the case should be decided on a *de novo* review of the administrative record ("AR").  (*Id.* at 4.)  However, in light of the fact that the Amended Pretrial Scheduling Order notes that "[e]ach party shall file a motion for summary judgment pursuant to [Rule] 52" (ECF No. 103 at 2), and the fact that Plaintiff is proceeding *pro se*, the Court shall construe Plaintiff's motion as a motion for judgment pursuant to Rule 52.

[3]      The following findings of fact are taken mostly verbatim from Defendants' motion for judgment.  (ECF No. 115-1.)  The facts are undisputed except where noted by the Court.

[4]      Defendants lodged the administrative record with the Court on August 8, 2018, documents bates-stamped AR 000001 through AR 001149.  (ECF No. 106.)

[5]      Plaintiff appears to dispute this point, but really contends he was never presented with this group insurance certificate by MetLife during the time he was covered by the Plan.  (ECF No. 128 at 6.)

2.      Benefits are payable after the employee has been disabled for 180 days, the Plan's "Elimination Period."  (*Id.* at 1095, 1107.)

3.      For LTD benefits, the Plan provides: "If You become Disabled while insured, Proof of Disability must be sent to Us.  When We receive such Proof, We will review the claim. If We approve the claim, We will pay the Monthly Benefit up to the Maximum Benefit Period shown in the SCHEDULE OF BENEFITS, subject to THE DATE BENEFIT PAYMENTS END section."  (*Id.* at 1107.)

4.      The Plan defines "Disabled/Disability" as follows:

> Disabled or Disability means that, due to Sickness or as a direct result of accidental injury:
> - You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
> - You are unable to earn:
>   - during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and
>   - unable to perform each of the material duties of Your Own Occupation; and
> - You are, after such period:
>   - unable to earn more than 60% of your Predisability Earnings from any employer in Your Local Economy; and
>   - unable to perform the duties of any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

(AR 1096.)

5.      "Own Occupation" is defined as "the essential functions You regularly perform that provide Your primary source of earned income."  (*Id.* at 1097.)

6.      "Proof" is defined as "Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate.  When a claim is made for any benefit described in this certificate, Proof must establish: [1] the nature and extent of the loss or condition; [2] Our obligation to pay the claim; and [3] the claimant's right to receive payment."  (*Id.* at 1099.)

7.      Thus, LTD benefits are payable for 24 months if the participant is disabled from performing the duties of his or her "own occupation."  (AR 1096.)  LTD benefits are payable

3

beyond 24 months only if the participant is disabled from performing the duties of "any gainful occupation." (*Id.*)

8.    The Return to Work Program: The Plan provides that disabled participants may participate in various "special services" provided by MetLife, including a Return to Work program ("RTWP").  The RTWP is designed to assist Disabled participants who are receiving disability benefits under the Plan return to work.  (AR 1125.)  The RTWP provides for various services such as vocational assessment, retraining programs, and job modifications/accommodations.  (*Id.*)

9.    A Participant Must Be Disabled to Receive Benefits Under the Plan: All of the Plan's benefits, including LTD and RTWP benefits, end on "the date You are no longer Disabled." (AR 1113.)  The Plan also provides that a participant will not receive RTWP services beyond the date he or she stops receiving monthly LTD benefits under the plan.  (*Id.* at 1108.)[6] The Plan's Summary Plan Description discusses this limitation as follows:

> Benefits received as a result of the [RTWP] will end either when the Insurance Company decides you are no longer eligible for the program or on any other date which monthly payments would stop under the LTD Plan, whichever is earlier.

(AR 1142.)[7]  Thus, once MetLife determined Plaintiff was not entitled to further LTD benefits, Plaintiff's potential entitlement to RTWP benefits and services ended.

B.    Plaintiff's Claim for Disability Benefits

1.    Plaintiff's Claims for STD and LTD Benefits: Plaintiff, an electrical engineer, stopped working following cardiac procedures in September/October 2009.  (AR 631, 691.)  In February 2010, Plaintiff submitted an LTD claim to MetLife.  (AR 619–35.)  Although he

---

[6]    Plaintiff is correct that the citation Defendants provided for this proposition (AR 1108) is incorrect.  (ECF No. 128 at 7.)

[7]    Plaintiff argues this citation is misleading because "it only relates to evaluation [of] when to stop benefit[s,] but in [P]laintiff['s] case it is about starting enrollment," as the Plan states that "[o]nce you are a covered employee, you are automatically eligible to participate" in the RTWP. (ECF No. 128 at 7 (citing AR 1139).)  It appears Plaintiff misconstrues Defendants' argument, which is that Plaintiff is not entitled to the RTWP benefit because he was no longer a covered employee at the time he applied for the benefit.

4

referenced his cardiac problems, Plaintiff's LTD claim seemed to focus on his psychiatric complaints.  In this regard, Plaintiff stated: "I feel depressed and incapable to return to my last job, feel anxiety and palpitations when facing these questions about [the] future." (*Id.* at 622.) Similarly, when asked if he could return to his occupation with accommodations, Plaintiff responded: "I wish I could but I am still troubled with medical and physical issues that make me [nummed?] and fill me with fear."  (*Id.*)

2.       MetLife obtained medical records from Plaintiff's treatment providers, including cardiologist Peter Callaham, M.D.  (AR 674–80, 692–720, 728–755.)  Dr. Callaham's records revealed that he was more concerned with Plaintiff's psychological reaction to his cardiac problems than his physical well-being.  (*Id.* at 700–05.)  For example, in an Attending Physician Statement ("APS") dated October 15, 2009, Dr. Callaham noted that Plaintiff "has developed severe anxiety reaction and anger management issues after his procedures." (*Id.* at 737.)

3.       Additionally, psychologist James Stratigakes, Ph.D. provided a Behavioral Health Functional Assessment Form indicating diagnoses of "anxiety related to med[ical] conditions (since 9/28/10)," "adjustment disorder w/ mixed anxiety and depression," and "obsessive compulsive disorder."  (*Id.* at 616.)  Dr. Stratigakes described the "symptoms, deficits, or functional impairments" preventing Plaintiff from returning to his job as follows: "anxiety and obsessive thinking in response to any discomfort/pain sensations in his chest." (*Id.* at 617.) Significantly, Dr. Stratigakes did not declare Plaintiff disabled from performing his job, but rather explained that Plaintiff "could perform [the] same job but psychologically a different way of working would be good for him."  (*Id.*)  He estimated that Plaintiff would return to part-time work by September 2010.  (*Id.*)

4.       Based on the nature of Plaintiff's cardiac problems and the information from Drs. Callaham and Stratigakes, MetLife approved Plaintiff's LTD claim in April 2010, and began paying him LTD benefits under the Plan.  (*Id.* at 611–13.)  MetLife thereafter continued to evaluate Plaintiff's entitlement to ongoing benefits.

5.      <u>Plaintiff's Cardiac-Based Impairment Resolved</u>[8]: In an APS dated October 22, 2010, Walt Marquardt, M.D., stated that he had advised Plaintiff to return to work in his "regular occupation, full-time" on December 15, 2010.  (*Id.* at 501.)  With respect to psychological functioning, Dr. Marquardt stated that Plaintiff was "able to function under stress and engage in interpersonal relations (no limitations)."  (*Id.*)

6.      Additionally, Plaintiff's updated medical records reflected normal cardiac test results.  For example, an ECG report dated February 15, 2011 concluded as follows: "No significant myocardial, valvular, or congenital heart disease."  (*Id.* at 506.)  Similarly, the "Conclusions" section in an Exercise Stress report dated February 23, 2011 stated as follows: "Stress and rest perfusion images are normal.  Normal LV [left ventricle] systolic function."  (*Id.* at 505.)  Although MetLife asked Dr. Stratigakes (in January and March 2011) to submit updated medical records or other documentation to support any ongoing psychological problems, Dr. Stratigakes did not submit any additional information.  (*Id.* at 517–21, 548–51.)

7.      In light of the above test results, Dr. Marquardt's opinion that Plaintiff could return to full-time work in his occupation, and the fact that no treating physician had provided additional medical support for ongoing behavioral health impairment, MetLife concluded that Plaintiff was no longer unable to perform the duties of his own sedentary occupation, and thus closed his claim.  This determination was conveyed to Plaintiff in a letter dated May 9, 2011.  (*Id.* at 493–95.)

8.      <u>After Receiving Additional Information, MetLife Reopened Plaintiff's LTD Claim But Then Concluded He Was Not Disabled</u>: In May 2011, Dr. Stratigakes submitted a Supplemental Functional Assessment Form and updated records to MetLife.  (*Id.* at 481–92.)  In that form, Dr. Stratigakes indicated that Plaintiff had improved ("less nervous & confused" and "less discouraged") but he was still experiencing some depression and anxiety "triggered by physical chest sensations."  (*Id.* at 483.)  Dr. Stratigakes reported "no psychotic process; no

---

[8]      Plaintiff objects to this characterization of his health condition as having been "resolved." (ECF No. 128 at 8.)  However, Defendants merely indicated that Plaintiff's doctor's letter concludes Plaintiff could return to work.

suicidal or homicidal ideation" (*id.* at 484) and offered a "guarded prognosis" for Plaintiff's return to work by October 2011. (*Id.* at 483.) In May 2011, Dr. Stratigakes elevated that prognosis to "fair to guarded." (*Id.* at 476.)

9.      In a letter dated June 6, 2011, MetLife told Dr. Stratigakes it needed "detailed information regarding symptoms and impairments preventing return to work," mental status examination results, and an estimated return to work date. (*Id.* at 469.) Also on June 6, 2011, a MetLife representative told Plaintiff that the information submitted by Dr. Stratigakes did not "give a full aspect of [Plaintiff's] condition," that it did not suffice to permit a decision as to Plaintiff's entitlement to further benefits, and that MetLife was awaiting Dr. Stratigakes's responses to its specific questions. (*Id.* at 878–79.) Nevertheless, MetLife told Plaintiff that it would reopen his claim pending its receipt of additional information, which it needed in order to "make an updated decision." (*Id.* at 879.) MetLife thus resumed monthly benefit payments to Plaintiff, as it continued to evaluate his claim. (*Id.* at 880.)

10.     In November 2011, Dr. Callaham represented to MetLife that Plaintiff would sit, stand, and walk for eight hours out of an eight-hour workday, and reported that Plaintiff was able to return to "full duty" work "now." (*Id.* at 393.)

11.     In January 2012, MetLife noted Dr. Stratigakes had not, in response to MetLife's request, provided any "clinical evidence or documentation to indicate significant difficulties in activities of daily living or in cognitive functioning secondary to a psychiatric condition." (*Id.* at 927.) MetLife further noted that Dr. Stratigakes's records did not reflect "specific information about the intensity, frequency and duration of psychological symptoms," and lacked "sufficient medical [data] to support a severity of illness and intensity of services to substantiate [Plaintiff's] inability to function as a hardware development engineer due to a psychiatric condition." (*Id.*)

12.     In February 2012, MetLife's Medical Director David Peters, M.D. reviewed all of the medical information in the file. (*Id.* at 332.) In his resulting report, Dr. Peters pointed out that more than two years had passed since Plaintiff's cardiac procedures, and further noted that Plaintiff's blood pressure and cholesterol were now well-controlled and he was physically active. (*Id.*) Dr. Peters concluded that Plaintiff was capable of performing full-time, primarily seated

work with only minimal physical restrictions (*i.e.*, lifting/pushing/pulling limited to 10 pounds or less on an occasional basis).  (*Id.*)  Dr. Peters added that "[t]here is no objective evidence of cognitive impairment that would prohibit a return to work . . . ."  (*Id.*)

13.    On February 16, 2012, MetLife sent Dr. Peters's report to Plaintiff's physicians and invited them to submit additional information if they disagreed with the report.  (*Id.* at 334–37.)  Neither Dr. Callaham nor Dr. Marquardt indicated any disagreement or otherwise responded to MetLife.  However, Dr. Stratigakes advised MetLife that he agreed with Dr. Peters's report:

> I read Dr. [Peters's] file Review dated 2/16/12.  I have no disagreement with his report . . . I saw [Plaintiff] on March 3, 2012.  I told him I had reviewed the report of the Medical Director who determined that [Plaintiff] is able to return to work.  I communicated to [Plaintiff] that I am in support of this report . . . .[9]

(*Id.* at 322–23.)  Thus, as of February 2012, none of Plaintiff's treating physicians disagreed with MetLife's conclusion that Plaintiff was able to return to work.[10]

C.    Because Plaintiff Was No Longer Disabled from Performing His Sedentary Job Duties, MetLife Terminated His LTD Claim

14.    Based on Dr. Peters's findings and opinions, the absence of any disagreement from Plaintiff's medical providers, and all of the information considered in connection with the claim, MetLife determined that Plaintiff was not entitled to further benefits under the terms of the Plan.  More specifically, on March 14, 2012, MetLife's LTD Claims Specialist determined that Plaintiff was no longer entitled to benefits under the Plan, as reflected by the following entry in the "Subject/Comments" section of the Claim Activity Report: "Claim Denied.  Medical no longer

---

[9]    Plaintiff asserts these sentences of Dr. Stratigakes's report were taken out of context by Defendants "to make it look like he agrees more with the Dr. Peters report than he does . . . ."  (ECF No. 128 at 9.)  However, a review of Dr. Stratigakes's report reveals that the text is how Defendants portray it in their statement of facts.

[10]    Plaintiff disagrees with this statement, contending that Defendants misconstrued Dr. Stratigakes's report dated May 17, 2012 and "failed to secure a comment from Dr. Marquardt on Dr. Peters['s] report."  (ECF No. 128 at 9–10 (citing AR 296).)  In reply, Defendants assert Dr. Stratigakes validated the entirety of Dr. Peters's report and his May 17, 2012 and July 19, 2012 letters "were entirely conclusory."  (ECF No. 134 at 7.)  The Court will address this issue later in the Order.

supports." (*Id.* at 956.)[11]  Subsequently, on March 15, 2012, the LTD Claims Specialist asked her LTD Unit Leader to review the decision to terminate Plaintiff's claim.  The "Response to Case Manager" entry dated March 15, 2012 reflects that the Unit Leader "[a]gree[d] with Termination decision," and that same entry (in the "Comment" section) also reflects the reason for the decision: "medical on file does not support inability to perform your sedentary occupation."  (*Id.* at 962.)

15.     On March 22, 2012, MetLife conveyed its determination to Plaintiff on the telephone and in a letter of the same date advising that his benefits would terminate as of March 22, 2012.[12]  (*Id.* at 319–21, 963–68.)  That same day, Plaintiff sent a letter to MetLife in which he stated, in part: "I am asking you . . . to enroll and coordinate me into the 'Return to work Services' Program as of Today."  (*Id.* at 315.)  That request was at odds with Plaintiff's statement during a March 12, 2012 call with a MetLife representative who mentioned possible vocational services, to which Plaintiff "stated he is not ready for [return to work]."  (*Id.* at 941–42.)

---

[11]     MetLife's decision to terminate Plaintiff's LTD benefits is also reflected in the Comments section of the "Action Plan – Case Management" entry dated March 14, 2012, in the "Medical Development" portion which states, in part, as follows: "Medical no longer supports [employee] unable to work."  (*Id.* at 959.)

[12]     Plaintiff asserts the verbal notice was inadequate and unclear, and he also emphasizes that he submitted his request to enroll in the RTWP prior to receiving the call terminating his LTD benefits.  (ECF No. 128 at 10.)

Regarding the letter specifically, MetLife contends its March 22, 2012 letter mistakenly referred to another plan (the Wells Fargo disability plan).  (AR 319.)  However, MetLife maintains the letter correctly identified Plaintiff's employer as "Thomson," accurately cited the Plan's relevant terms, and explained the reasoning and medical information that supported the determination made on Plaintiff's claim.  (ECF No. 115-1 (citing AR 319–21).)  On March 30, 2012, MetLife sent a letter correcting this error, but that letter erroneously stated Plaintiff's benefits "terminated effective March 30, 2012."  (AR 308 – 10.)  Defendants maintain, however, Plaintiff's benefits were terminated on March 22, 2012.  (ECF No. 115-1 at 11 (citing AR at 319–21, 963–68).)  Plaintiff contends Defendants' admissions regarding theses mistakes renders the letters invalid.  (ECF No. 128 at 11.)  While the Court finds that MetLife's termination letters to Plaintiff contain significant mistakes and were haphazardly put together, the Court ultimately disagrees with Plaintiff.  The Plan states that MetLife "will make subsequent payments monthly . . . so long as You remain Disabled."  (AR 1107.)  Nothing in the Plan states that MetLife is required to provide Plaintiff with notice prior to terminating benefit payments (*id.* at 1076–1122), and the March 22, 2012 letter did contain all of the relevant information as outlined by MetLife above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.   Plaintiff Appealed MetLife's Claim Determination

16.   By letter dated June 20, 2012, Plaintiff appealed MetLife's LTD claim determination. (*Id.* at 276–78.) Plaintiff submitted a March 23, 2012 letter from Dr. Marquardt explaining the reasons why Plaintiff (as opposed to Dr. Marquardt) felt he could not return to work. In this regard, Dr. Marquardt wrote as follows:

> The patient does not feel capable of sitting, standing, or walking intermittently for 8 hours or lift/carry up to 10 pounds frequently with occasional lifting to 20 pounds until he has undergone angiographic assessment of his coronary stent patency. He is therefore to remain disabled until after his coronary angiogram.

(*Id.* at 279.)

17.   Additionally, in a one-page letter dated July 19, 2012, Dr. Stratigakes stated, in conclusory fashion, that Plaintiff had become more depressed and more anxious since March 2012, and that he was caring for his wife who also suffered from depression. (*Id.* at 270.) Dr. Stratigakes opined at that time that Plaintiff was "disabled and not able to work." (*Id.*) However, his opinion was not supported by any detailed clinical information or observations, or any other indicia typically seen with a disabling psychiatric condition, such as increased treatment sessions, a referral to a psychiatrist and/or for cognitive testing, or pharmacology with prescription medications.[13] (*Id.*)

18.   In August 2012, MetLife arranged for two independent physician consultants ("IPC") — Marcus Goldman, M.D., a Board-certified psychiatrist, and Christine Lawless, M.D., a Board-certified cardiologist — to review the medical information. (*Id.* at 226–30, 242–45.) Dr. Goldman concluded that the information did not support functional limitations that would impair Plaintiff's ability to work full-time:

> From a psychiatric perspective the data suggests complaints of work stress and jobs fit, rather than a globally or functionally impairing mental condition or mental disorder. The claimant['s] anxiety regarding his cardiac status would not be deemed inappropriate or pathological. There is no evidence of active pharmacotherapy and

---

[13]   Plaintiff disputes this point, contending that his frequent visits to the doctor on March 3, March 5, March 7, and March 19 "shows an important clinical sign of the severeness of [his] mental issues." (ECF No. 128 at 11.)

there are no notes from a psychiatrist.  There are no serial mental status examinations for review and no data to support loss of global functionality.

(*Id.* at 244.)

19.     Dr. Goldman also spoke with Dr. Stratigakes on August 9, 2012, who reported that Plaintiff's wife and daughter were experiencing emotional problems and Plaintiff was "helping tend to his wife."  (*Id.* at 237.)  However, Dr. Goldman's opinion remained unchanged following his call with Dr. Stratigakes, and Dr. Goldman further explained his opinion as follows: "While understandably stressed, the claimant is suggested to have been active globally, with no cognitive impairment or significant dysfunction in attention to personal grooming or hygiene.  There was no evidence of a vegetative depression or a thought disorder."  (*Id.*)

20.     Dr. Lawless focused on Plaintiff's physical health.  She noted that although Plaintiff was anxious about his coronary disease, he had not (since October 2009) been rehospitalized for chest pains, had not made frequent trips to see his physicians, and his reports of chest pain/discomfort had been brief and infrequent.[14]  (*Id.* at 226, 229.)  Dr. Lawless also pointed out that Plaintiff's cardiologist had repeatedly reassured him that his cardiac test results were excellent and showed no ischemia, and Plaintiff's most recent exercise performance on a stress test was excellent.  (*Id.* at 226–27, 229.)  Dr. Lawless found "no clinical evidence to support restrictions and limitations" that might preclude Plaintiff from performing full-time sedentary work in his own occupation.  (*Id.* at 229–30.)

21.     MetLife sent the IPC reports to Drs. Stratigakes and Marquardt.  (*Id.* at 221, 223.)  Dr. Stratigakes responded with another one-page, conclusory letter dated September 18, 2012, in which he declared that Plaintiff "had functional limitations during the period under evaluation."  (*Id.* at 196.)  But he again failed to support his opinion with any meaningful clinical information, and instead primarily based his conclusion on Plaintiff's self-reported problems in performing projects (such as the rebuilding of a Volkswagen van) at home.  (*Id.*)  Dr. Stratigakes again made

---

[14]     Plaintiff also disputes this point, contending that he has had frequent doctor visits.  However, much like his prior objection, Plaintiff does not cite to any doctor appointments in the AR to confirm this.

1    no mention of any referral to a psychiatrist and/or for cognitive testing, or pharmacology with

2    prescription medications.  (*Id.*)

3       22.    Dr. Marquardt responded to MetLife with a letter dated September 26, 2012, in

4    which he confirmed Plaintiff's last ECG was "negative for myocardial ischemia."  (*Id.* at 193 –

5    94.)  He added that Plaintiff has "had no episodes of chest discomfort" since starting his cardiac

6    medication, though Plaintiff did complain of some fatigue, exercise intolerance, and sleep

7    disturbances.  (*Id.* at 193.)  Relying solely on Plaintiff's self-reported complaints, Dr. Marquardt

8    reported that Plaintiff was unable to return to his previous occupation as an engineer.  (*Id.*)

9       23.    MetLife reviewed the letters from Drs. Stratigakes and Marquardt and determined

10   that although they disagreed with the conclusions of Dr. Goldman and Dr. Lawless, Drs.

11   Stratigakes and Marquardt "did not provide any new clinical findings to aid in establishing

12   [restrictions and limitations]."  (*Id.* at 1038.)

13      24.    Additionally, MetLife arranged for Plaintiff's file to be reviewed by a Vocational

14   Rehabilitation Consultant ("VRC") in August 2012.  (*Id.* at 1012–15.)  The VRC confirmed that,

15   based on the medically supported restrictions and limitations, Zelhofer could perform his own

16   occupation and earn a gainful wage in the local economy.  (*Id.* at 1015.)

17              E.    MetLife Upheld Its Claims Determination

18      25.    Based on the findings and opinions of Dr. Peters, Dr. Goldman, Dr. Lawless, and

19   the VRC, and because the information in the Administrative Record did not support that Plaintiff

20   was disabled as defined by the Plan as of March 22, 2012, MetLife upheld its termination of

21   benefits.  (*Id.* at 187–91, 1038.)  By letter dated October 11, 2012, MetLife notified Plaintiff of

22   its appeal decision:

23              [T]he original determination to terminate benefits beyond March 22,
              2012 was upheld upon appeal review due to the determination that
24            the medical information on file did not establish that you had
              functional restrictions and limitations beyond March 22, 2012 that
25            would preclude you from performing your own occupation from any
              employer in Your Local Economy.
26

27   (*Id.* at 187.)  In that same letter, MetLife told Plaintiff that the information received from Drs.

28   Stratigakes and Marquardt on appeal "lacked any new and compelling clinical findings not

1    previously considered by the IPC as it related to the time period beyond March 22, 2012." (*Id.* at

2    190.)  MetLife's letter concluded, in part, as follows:

3              MetLife acknowledges that you continued to have complaints of pain
               and impairment due to your reported physical and psychological
4              conditions.   However, the Plan's definition requires that you be
               unable to earn more than 80% of your predisability Earnings at your
5              Own Occupation for any employer in your Local Economy . . . . we
               acknowledged that you had restrictions and limitations due to your
6              pain and other medical conditions, however, they would not preclude
               you from performing your own occupation.
7

8    (*Id.* at 191.)

9         **II.    PLAINTIFF'S MOTION FOR ADMISSIONS OF EXTRINSIC EVIDENCE**

10        As a preliminary matter, the Court agrees with Plaintiff that Defendant's opposition to his

11   motion was untimely filed.  (ECF No. 132 at 2–3.)  The Amended Pretrial Scheduling Order

12   provides that "[a]ll motions related to the admissibility of extrinsic evidence outside of the

13   administrative record shall be filed and briefed contemporaneously with the parties' cross-

14   motions for summary judgment" and that "[o]ppositions shall be filed on or before December 24,

15   2018."  (ECF No. 103 at 2–3.)  As Defendant's opposition was filed on January 7, 2019 (ECF No.

16   129), the Court STRIKES the opposition from the record and declines to consider the arguments

17   therein.

18        Plaintiff requests the Court consider: (1) audio recordings of "his conversations with

19   [Defendant's] agents during the relevant time of his [long-term disability] plan as audio

20   recordings and transcripts" (Exhibits C, E, F); (2) the insured's job description (Exhibit A); (3)

21   and Defendant's life insurance and "other key Plan definition and insurance documents" (Exhibits

22   B, D, G).  (ECF No. 119 at 2, 7.)

23        The Supreme Court has noted that "to the extent [ERISA plan] participants fail to develop

24   evidence during internal review, they risk forfeiting the use of that evidence in district court.  The

25   Courts of Appeal have generally limited the record for judicial review to the administrative record

26   compiled during internal review."  *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 111

27   (2013).  The Ninth Circuit has held that new evidence may be considered in ERISA cases under

28   limited certain circumstances "to enable the full exercise of informed and independent judgment."

                                                 13

1    *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995);

2    *Opeta v. Nw. Airlines Pension Plan for Contract Emp.*, 484 F.3d 1211, 1217 (9th Cir. 2007).  It

3    has "cited with approval the rule of the Fourth Circuit that the district court should exercise its

4    discretion to consider evidence outside of the 'administrative record *only* when circumstances

5    *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of

6    the benefit decision.'"  *Opeta*, 484 F.3d at 1217 (emphasis in original) (quoting *Mongeluzo*, 46

7    F.3d at 944; *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en

8    banc)).

9            In most cases only the evidence before the plan administrator at the time of the

10   determination should be reviewed and district courts should not consider additional evidence

11   "merely because someone at a later time comes up with new evidence."  *Id.* (quoting *Mongeluzo*,

12   46 F.3d at 944).  The Ninth Circuit also cited the Fourth Circuit's non-exhaustive list of limited

13   circumstances under which introduction of extrinsic evidence may be necessary:

14              claims that require consideration of complex medical questions or
              issues regarding the credibility of medical experts; the availability of
15             very limited administrative review procedures with little or no
              evidentiary record; the necessity of evidence regarding interpretation
16             of the terms of the plan rather than specific historical facts; instances
              where the payor and the administrator are the same entity and the
17             court is concerned about impartiality; claims which would have been
              insurance contract claims prior to ERISA; and circumstances in
18             which there is additional evidence that the claimant could not have
              presented in the administrative process.
19

20   *Id.* (citing *Quesinberry*, 987 F.2d at 1027).  However, the Ninth Circuit has held that additional

21   evidence outside the administrative record may be considered "to decide the nature, extent, and

22   effect on the decision-making process of any conflict of interest; the decision on the merits,

23   though, must rest on the administrative record once the conflict (if any) has been established, by

24   extrinsic evidence or otherwise."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th

25   Cir. 2006); *see also Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 976–79 ("In determining

26   whether a plan administrator's conflict of interest affected its decision to deny benefits, evidence

27   outside the administrative record may be considered.").

28   ///

14

1    Here, the crux of Plaintiff's argument is that there were structural and procedural conflicts

2    of interest, as Defendant's administrator worked in the termination decision and the administrator

3    "applied self-serving selectivity in the use and interpretation of physician's reports . . . [and]

4    totally ignored the lack of report on mental disability and lack of job description data . . . ."  (ECF

5    No. 119 at 4–5 (internal quotation marks omitted).)

6    The evidence Plaintiff seeks to admit is relevant to whether Plaintiff was wrongfully

7    denied his disability benefits under the Plan.  Plaintiff admits as much, as he argues this extrinsic

8    evidence is "crucial" because it "eliminat[es] elements from future dispute," "simplif[ies] and

9    shorten[s] [the] Court's trial time and cost," and "serves as an undisputed evidence base for

10    Plaintiff's contemporaneously submitted 'Motion for Summary [Judgment] pursuant to [Rule]

11    52."  (ECF No. 119 at 2–3.)  The Court therefore ultimately declines to consider the extrinsic

12    evidence proffered by Plaintiff because Plaintiff has not persuaded the Court that the evidence is

13    relevant as to whether there were structural and procedural conflicts of interest.  *See Abatie*, 458

14    F.3d at 970; *Tremain*, 196 F.3d at 976–79.  Accordingly, Plaintiff's motion for admission of

15    extrinsic evidence is hereby DENIED.

16    **III.    CONCLUSIONS OF LAW**

17    A.    Legal Standard

18    1.    Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . the

19    court must find the facts specially and state its conclusions of law separately.  The findings and

20    conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of

21    decision filed by the court.  Judgment must be entered under Rule 58."

22    2.    This Court has jurisdiction over Plaintiff's claims pursuant to ERISA.  *Clorox Co.*

23    *v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521 (9th Cir. 1985) ("ERISA creates a

24    federal cause of action, with concurrent state and federal jurisdiction, over claims by an employee

25    'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of

26    the plan, or to clarify his rights to future benefits under the terms of the plan.'" (quoting 29 U.S.C.

27    § 1132(a)(1)).

28    ///

3.     "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal citations and quotation marks omitted).  "Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place." *Id.* at 516–17 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

4.     The parties agree that the long-term disability plan at issue in this case is an "employee welfare benefit plan" subject to ERISA.  *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" and "welfare plan" to include "any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise[ ] . . . benefits in the event of sickness, accident, disability, death or unemployment.").

5.     "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "[F]or a plan to alter the standard of review from the default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Abatie*, 458 F.3d at 963 (italics added).

6.     Because the parties have not pointed to a provision in the policy vesting the administrator with discretionary authority, the Court finds that *de novo* review to be applicable standard of review in the instant case.

7.     *De novo* review "can best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Kollar v. Sun Life Assurance Co. of Canada*, No. C20-5278-JCC, 2021 WL 2949801, at *2 (W.D. Wash. July 14, 2021) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)).  "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled

1   under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th

2   Cir. 2010) (italics added); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.

3   1999) (explaining that in a trial on the administrative record, "[the] district judge will be asking . .

4   . as he reads the evidence, . . . whether [the plaintiff] is disabled within the terms of the policy"

5   and may "evaluate the persuasiveness of conflicting testimony and decide which is more likely

6   true").

7        8.      This Court therefore does not examine whether MetLife's actions were

8   reasonable. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir. 2009),

9   (holding that, under abuse of discretion standard, the plan administrator's decision can be upheld

10  if it is "grounded on any reasonable basis." (internal citation omitted)); *see also Conkright*, 559

11  U.S. at 521 ("Applying a deferential standard of review . . . means only that the plan

12  administrator's interpretation of the plan 'will not be disturbed if reasonable.'"

13  (quoting *Firestone*, 489 U.S. at 111)).  Rather, the Court will examine the facts in the first

14  instance to determine whether Plaintiff is disabled.

15       9.      In an ERISA action, the plaintiff carries the burden of showing, by a

16  preponderance of the evidence, that he or she was disabled under the terms of the Plan during the

17  claim period. *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. Jan. 5, 2011).

18            B.      Analysis

19       10.      Plaintiff's singular remaining claim is for the recovery of benefits under the Plan

20  pursuant to ERISA § 502(a)(1)(B).  (*See* ECF Nos. 49, 62.)  Plaintiff's LTD benefits became

21  payable as of March 27, 2010.  (AR 611–13.)  Defendants contend Plaintiff's LTD benefits

22  terminated on March 22, 2012.  (AR 319–21.)  Accordingly, the sole issue in the instant cross-

23  motions for judgment is whether Plaintiff was disabled on March 22, 2012 and therefore entitled

24  to benefits.

25       11.      In his motion for judgment, Plaintiff argues he has sufficiently established that he

26  has a disability, the Plan was improperly terminated, and his written request for RTWP benefits

27  was improperly denied while he was covered by the Plan.  (ECF No. 125 at 7.)  In its motion for

28  judgment, Defendants assert that: (1) Plaintiff's diagnoses for various medical conditions are

1    insufficient to establish that he has a disability; (2) Plaintiff's subjective complaints are subject to

2    medical verification and his physicians' conclusory opinions are not controlling; (3) Plaintiff is

3    not entitled to RTWP benefits; and (4) Technicolor cannot be held liable for the denial of

4    benefits. (ECF No. 115-1 at 16–22.)

5        12.    Medical records demonstrate that Plaintiff was no longer disabled and unable to

6    complete the material duties of his own occupation at the time MetLife terminated his LTD

7    benefits on March 22, 2012. Although Plaintiff continued to complain of psychological distress

8    after that date, the evidence — in the form of evaluations completed by Plaintiff's doctors,

9    MetLife's Medical Director, two IPCs, and the VRC — supports the conclusion that Plaintiff was

10   no longer disabled as of March 22, 2012. The medical records reveal that Plaintiff's symptoms

11   related to both his heart and psychological conditions continued to get better with time such that

12   none of his doctors disagreed he was able to complete the material duties of his own occupation

13   on March 22, 2012.

14       13.    **Plaintiff's cardiac-related disability as evaluated by Dr. Callaham**: Medical

15   records from Plaintiff's cardiologist, Dr. Callaham, establish that Plaintiff's heart-related

16   problems improved over the two years MetLife paid LTD benefits. Dr. Callaham noted in an

17   APS dated October 15, 2009 that Plaintiff "needs time to rehabilitate and get counseling prior to

18   any return to work." (AR 731, 734.) Dr. Callaham stated Plaintiff "has developed severe anxiety

19   reaction and anger management issues after his procedures" and the doctor was "referring him to

20   psychological counseling." (*Id.* at 737.) Dr. Callaham estimated that Plaintiff would be

21   "incapacitated" for about three months and that he would need a part-time or reduced work

22   schedule from four to six hours per day from January 10, 2020 to June 10, 2010, as "he'll need to

23   ease into [a] work schedule." (*Id.*) Dr. Callaham's notes from a follow-up visit on November 20,

24   2009 reveal that Plaintiff was still seeing Dr. Stratigakes for anxiety and that "he'll continue to

25   work [with] Dr. Stratigakes regarding his stress [and] whether to go back to work." (*Id.* at 680.)

26   In a follow-up sheet dated June 27, 2011, Dr. Callaham noted Plaintiff's "lifestyle has been

27   cautious lately" and Plaintiff "has had a rough month stress wise." (*Id.* at 396.) Dr. Callaham

28   noted Plaintiff had been "doing his best to do his part to improve [his] life through diet [and]

exercise." (*Id.*)  In a follow-up sheet dated September 22, 2011, Dr. Callaham noted that Plaintiff "still goes to cardiac rehab 2x/week" and that he was "assess[ed] stable." (*Id.* at 395.)  Dr. Callaham also noted that he had "a planned angiogram" with Dr. Marquardt.  (*Id.*)  In November 2011, Dr. Callaham represented to MetLife in a questionnaire that Plaintiff could sit, stand, and walk intermittently for an eight-hour workday and that he was able to return to "full duty" work "now."  (*Id.* at 393.)

14.    As noted previously, when MetLife sent Dr. Peters's report to Dr. Callaham (*id.* at 334–37), Dr. Callaham did not respond to MetLife's invitation to submit additional information if he disagreed with Dr. Peters's report.  Accordingly, as of March 22, 2012, Dr. Callaham did not disagree with the conclusion that Plaintiff was physically able to return to work.

15.    <u>**Plaintiff's cardiac-related disability as evaluated by Dr. Marquardt**</u>: An APS dated October 22, 2010, provided by Dr. Marquardt, Plaintiff's cardiologist, notes that he advised Plaintiff to return to work full-time by December 15, 2010.  (*Id.* at 501.)  With respect to psychological functioning, Dr. Marquardt noted Plaintiff was "able to function under stress and engage in interpersonal relations (no limitations)."  (*Id.*)  Furthermore, an echocardiographic report dated February 15, 2011 and signed by Dr. Marquardt concluded as follows: "No significant myocardial, valvular, or congenital heart disease." (*Id.* at 506–07.)  An Exercise Stress report dated February 23, 2011 and ordered by Dr. Marquardt stated as follows: "Stress and rest perfusion images are normal . . . [n]ormal [left ventricle] size and function." (*Id.* at 505.)  In a letter to MetLife dated February 15, 2011, Dr. Marquardt stated:

> Despite no evidence for ischemia by stress echocardiogram in January 2010, [Plaintiff] continues to complain of easy fatigability and inability to tolerate occupational and financial stress.  Exposure to life stressors results in [Plaintiff] becoming profoundly fatigued without the stamina and focus to tolerate occupational stress. [Plaintiff] states that since undergoing his percutaneous coronary intervention in 2009, that he has not been capable of completing complex tasks requiring rapid decision making.

(*Id.* at 460.)  Dr. Marquardt concluded Plaintiff "should remain on disability until further notice." (*Id.*)

///

16.     MetLife sent Dr. Marquardt a letter dated November 15, 2011, asking him for medical information "from June 2011 to present" to be submitted by December 15, 2011 so that it could make a decision on Plaintiff's LTD benefits claim.  (*Id.* at 413.)  A questionnaire dated November 28, 2011 signed by Dr. Marquardt indicated that Dr. Marquardt believed Plaintiff could sit continuously for eight hours, stand continuously for six hours, and walk intermittently for four hours (all with breaks every two hours).  (*Id.* at 329.)  Dr. Marquardt also noted Plaintiff could occasionally (up to 2.5 hours) climb and twist/bend/stoop, frequently (2.5–5.5 hours) reach above shoulder level, and continuously (5.5–8 hours) reach front and side at desk level and perform fine finger movements and eye/hand movements.  (*Id.* at 329.)  Dr. Marquardt checked a box that Plaintiff is "at maximum medical improvement" but did not provide an estimated return to work date.  (*Id.*)

17.     As noted previously, when MetLife sent Dr. Peters's report to Dr. Marquardt (*id.* at 334–37), Dr. Marquardt did not respond to MetLife's invitation to submit additional information if he disagreed with Dr. Peters's report.  Accordingly, as of March 22, 2012, Dr. Marquardt did not disagree with the conclusion that Plaintiff was physically able to return to work.

18.     Post-termination of LTD benefits, in a letter to MetLife dated March 23, 2012, Dr. Marquardt stated Plaintiff "has become extremely anxious regarding his stent patency and is requesting that he undergo a diagnostic angiogram in the near future" and "does not feel capable of sitting, standing, or walking intermittently for 8 hours or lift[ing]/carry[ing] up to 10 pounds frequently with occasional lifting to 20 pounds until he has undergone angiographic assessment of his coronary stent patency."  (*Id.* at 292.)  Dr. Marquardt also stated Plaintiff "is therefore to remain disabled until after his coronary angiogram."  (*Id.*)

19.     **Plaintiff's psychological disability**: A Behavioral Health Functional Assessment Form dated February 19, 2010 provided by Dr. Stratigakes, one of Plaintiff's psychologists, indicates diagnoses of "anxiety related to med[ical] condition since (9/28/10)," "adjustment disorder [with] mixed anxiety and depression," and "obsessive compulsive disorder."  (*Id.* at 616.)  Dr. Stratigakes listed the "symptoms, deficits, or functional impairments" preventing

Plaintiff from returning to his job as "anxiety and obsessive thinking in response to any discomfort/pain sensations in his chest." (*Id.* at 617.)  With respect to whether Plaintiff could perform his same job in another department or division of his company, Dr. Stratigakes noted Plaintiff "could perform [the] same job but psychologically a different way of working would be good for him." (*Id.*)  Dr. Stratigakes provided September 1, 2010 as an estimated date for return to work, initially part-time. (*Id.*)  With respect to the types of reasonable accommodations and expected duration that would facilitate a re-entry into the workplace, Dr. Stratigakes estimated a flexible work schedule for three to four months. (*Id.*)  Dr. Stratigakes's overall evaluation was that Plaintiff's "impairment significantly affects ability to function." (*Id.*)  Dr. Stratigakes noted as of early February 2010: "[zero] suicidal or homicidal thinking; [zero] psychotic or thought-disordered process; anxious-depressed moods; excessive worry-obsessive thinking . . . ." (*Id.* at 618.)

20.    MetLife asked Dr. Stratigakes to submit updated medical records on January 18, 2011 and March 25, 2011 to support ongoing psychological problems, but Dr. Stratigakes did not submit any additional information. (*Id.* at 517–521, 548–551.)

21.    On May 10, 2011, Dr. Stratigakes submitted a Supplemental Functional Assessment Form and updated records to MetLife. (AR 481–92.)  The form, dated April 15, 2011, reveals Dr. Stratigakes indicated Plaintiff was "less nervous & confused[,] slightly less discouraged" but was still experiencing some depression and anxiety "triggered by physical chest sensations." (AR 483.)  Dr. Stratigakes provided a "guarded prognosis" with an estimated return to work date of October 2011 with "<u>perhaps</u> a flex work schedule, part-time." (*Id.* (emphasis in original).)  Dr. Stratigakes also reported "no psychotic process; no suicidal or homicidal ideation." (*Id.* at 484.)

22.    On May 30, 2011, Dr. Stratigakes submitted a letter to MetLife with a summary of Plaintiff's "symptomatology and course in treatment" in which he noted a part of Plaintiff's treatment plan is "[t]o assist [Plaintiff] in returning to work" and his prognosis to "fair to guarded." (*Id.* at 473–76.)

///

23.     In a letter dated June 6, 2011, MetLife told Dr. Stratigakes it needed "detailed information regarding symptoms and impairments preventing return to work," mental status examination results, and an estimated return to work date.  (*Id.* at 469.)  Dr. Stratigakes responded to MetLife in a letter dated June 17, 2011, in which he notes regarding Plaintiff's estimated return to work: "The extent of [Plaintiff's] medical disability is unclear to me.  This has a significant impact on his psychological process which in my opinion is also significantly affecting his capacity to return to work."  (*Id.* at 465–66.)

24.     In a letter dated December 13, 2011, Dr. Stratigakes continued to note that a part of Plaintiff's treatment plan is "[t]o assist [Plaintiff] in returning to work."  (*Id.* at 355–57.)

25.     In a letter dated March 23, 2012, Dr. Stratigakes noted he "strongly recommend[s] . . . that MetLife continue to support [Plaintiff's] disability claim for six more months" until after Plaintiff's next angiogram and asks MetLife to provide Plaintiff with vocational training for a new career.  (*Id.* at 288, 312, 314.)

26.     In a letter to MetLife dated March 5, 2012, Dr. Stratigakes stated: "**I read Dr. Peter[s's] File Review dated 2/16/12.  I have no disagreement with his report.**  I saw [Plaintiff] on March 3, 2012.  I told him I had reviewed the report of the Medical Director who determined that he . . . is able to return to work.  **I communicated to [Plaintiff] that I am in support of this report.**  I also told him that I thought vocational rehabilitation could be a smart choice given he had experienced so much stress at his last position."  (*Id.* at 323 (emphasis added).)

27.     Post-termination of Plaintiff's LTD benefits, Dr. Stratigakes's letters contradict his March 5, 2012 letter agreeing with Dr. Peters's file review.  In an APS dated March 5, 2012, Dr. Stratigakes noted Plaintiff can work a total of "4–8 hours per day" and expects improvement.  (*Id.* at 325.)  Dr. Stratigakes stated:

> I think once [Plaintiff] is in the right work setting for him [and] he realizes he can handle it physically he will realize it is also good for his self-esteem . . .   I told [Plaintiff] I think he is ready psychologically to transition into working again . . . I agree [with] medical director's report regarding 10 pound or less weight restriction; I do not recommend work where he could be at a desk working alone for too long.  I know [Plaintiff's] last position was not

> the kind of creative challenge he needs.  That is why I am suggesting voc[ational] rehab[ilitation] [and] for him to discover what he'd really like to do.

(*Id.*)  With respect to date of return, Dr. Stratigakes noted "6 [months]" and "I suggest 9/1/12."

(*Id.*)

28.     In a letter dated May 17, 2012, Dr. Stratigakes expressed concerns "the recommendations [he] communicated to MetLife regarding [Plaintiff's] transition to working again have been misconstrued and taken out of context."  (*Id.* at 296.)  Dr. Stratigakes emphasizes Plaintiff "is NOT ready to go to work right now, "needs a period of structured back-to-work transition," and "[a] full-time position would be too stressful for him . . . jumping to full-time would not be advised."  (*Id.*)  Dr. Stratigakes "recommend[ed] MetLife's back-to-work program for [Plaintiff]."  (*Id.*)

29.     In a letter dated July 19, 2012, Dr. Stratigakes notes Plaintiff "is disabled and not able to work."  (*Id.* at 270.)  Dr. Stratigakes notes that since March 22, 2012, he has observed Plaintiff become "more depressed and more anxious," and provides details regarding the issues Plaintiff is anxious about.  (*Id.*)

30.     **Weight afforded Plaintiff's doctors**: Defendants argue the letters submitted by Drs. Stratigakes and Marquardt post-termination of benefits "contained very conclusory opinions that were seemingly based on [Plaintiff's] self-reported complaints."  (ECF No. 115-1 at 17.)  Specifically, Defendants argue Drs. Marquardt and Dr. Stratigakes's post-termination letters do not offer their personal opinions about Plaintiff's ability to return to work nor do they establish that Plaintiff "was unable to perform the duties of his own occupation at any time, much less as of March 22, 2012."  (*Id.*)  While Defendants are correct in their assertion that treating physicians are not accorded any special deference in ERISA cases (*id.* at 19), the Court may still evaluate the relative weight of reviewing physicians based on their opportunity to evaluate a plaintiff.  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (medical opinions rendered after in-person examination more persuasive than contrary opinions following paper-only review of records); *Filarsky v. Life Ins. Co. of N. Am.*, 391 F. Supp. 3d 928, 942 (N.D. Cal. 2019) ("While deference is not necessarily owed to treating physicians in ERISA cases,

conclusions drawn at the end of in-person medical examinations are inherently more helpful because the treating physician observes and interacts with the patient for several minutes at a time"). "A treating physicians' opinion may merit less weight where, for example, the relationship between the claimant and the physician has been of short duration or where a non-treating specialist has pertinent expertise that the treating physician lacks." *Filarsky*, 391 F. Supp. 3d at 939 (internal quotation marks omitted). The weight given to an examining doctor's conclusions and diagnosis is based upon: "(i) the extent of the patient's treatment history; (ii) whether the examining physician specializes in the condition at issue; and (iii) how much detail the examining physician provides to support his conclusions." *Id.* at 940.

31.     Here, Plaintiff's treating physicians, Drs. Callaham, Marquardt, and Stratigakes, all have long histories of treating Plaintiff for his cardiac-related health conditions since they first arose in 2009 and his subsequent psychological conditions. Drs. Callaham and Marquardt are cardiologists and Dr. Stratigakes is a psychologist, and all of these doctors specialize in Plaintiff's conditions. These doctors were able to interact with Plaintiff and make observations as to his functionality, pain levels, and ability to work. All these doctors were working toward Plaintiff's recovery and made notes reflecting changes in his status.

32.     With respect to Plaintiff's cardiac-related disability, the Court finds that the opinions and findings of Drs. Callaham and Marquardt to hold significant weight in determining that Plaintiff was no longer disabled. The most recent communication from Dr. Callaham prior to MetLife's termination of benefits confirms this. As previously noted, in November 2011, Dr. Callaham represented to MetLife in a questionnaire that Plaintiff could sit, stand, and walk intermittently for an eight-hour workday and that he was able to return to "full duty" work "now." (AR 393.) The same holds true for Dr. Marquardt. As previously noted, the questionnaire dated November 28, 2011 signed by Dr. Marquardt indicated that Dr. Marquardt believed Plaintiff could sit continuously for eight hours, stand continuously for six hours, and walk intermittently for four hours (all with breaks every two hours). (*Id.* at 329.) Dr. Marquardt also noted Plaintiff could occasionally (up to 2.5 hours) climb and twist/bend/stoop, frequently (2.5–5.5 hours) reach above shoulder level, and continuously (5.5–8 hours) reach front and side at desk level and

perform fine finger movements and eye/hand movements.  (*Id.* at 329.)  Dr. Marquardt checked a box that Plaintiff is "at maximum medical improvement" but did not provide an estimated return to work date.  (*Id.*)

33.    Additionally, the findings of the IPC support this conclusion.  The first IPC, Dr. Christine Lawless, completed a physician consultant review dated August 29, 2012.  (*Id.* at 226–30.)  Dr. Lawless is Board-Certified in cardiology, internal medicine, sports medicine, and lipidology.  (*Id.*)  Dr. Lawless provided an extensive summary of the documents that she reviewed.  (*Id.* at 227–28.)  Dr. Lawless's review was limited to "the cardiac aspects of this case because Psychiatry is outside the scope of [her] practice."  (*Id.* at 229.)  Dr. Lawless provided a thorough review of Plaintiff's cardiac history and concluded that "[t]here is no clinical evidence to support restrictions and limitations and/or side effects resulting from the medications taken by [Plaintiff] from 3/23/2012 to the present and beyond."  (*Id.* at 229–30.)  Dr. Lawless also noted "[b]ased on the infrequent chest pain, the excellent exercise performance on [the] last stress test, and all the available medical information," Plaintiff's functional ability beyond 3/23/2012 is as follows: (1) sitting for 8 hours; (2) standing for 2–4 hours; (3) walking for 2 hours total in shorter increments of 10–20 [minutes?] each; (4) lifting up to 25 pounds; and (5) unlimited with respect to fingering/handling/grasping, repetitive movement (hands & wrists), and concentrated visual attention.  (*Id.*)

34.    Accordingly, the Court finds Plaintiff was no longer physically disabled when MetLife terminated his LTD benefits on March 22, 2012.

35.    With respect to Plaintiff's psychological-related disability, the Court finds that Dr. Stratigakes's contradictory letters as well as Dr. Marquardt's March 23, 2012 letter make the post-termination evidence weak.  After Dr. Peters completed his file review, Dr. Stratigakes sent MetLife a March 5, 2012 letter stating that he has "no disagreement" with Dr. Peters's report and even communicated to Plaintiff that he is in support of the report.  (*Id.* at 323.)  In sharp contrast, after MetLife terminated Plaintiff's benefits and Plaintiff sought assistance from Dr. Stratigakes, Dr. Stratigakes submitted a number of letters contradicting this March 5, 2012 letter.  Dr. Marquardt's March 23, 2012 letter additionally only details what Plaintiff has reported, as Dr.

1    Marquardt noted that Plaintiff "does not feel capable of sitting, standing, or walking intermittently

2    for 8 hours or lift/carry up to 10 pounds frequently with occasional lifting to 20 pounds until he

3    has undergone angiographic assessment of his coronary stent patency." (*Id.* at 292.) Dr.

4    Marquardt stated Plaintiff "is therefore to remain disabled until after his coronary angiogram."

5    (*Id.*)

6         36.    Again, here, the findings of the IPC support Drs. Marquardt and Stratigakes's pre-

7    termination conclusions. The second IPC, Dr. Marcus Goldman, completed a physician

8    consultant review dated August 9, 2012. (*Id.* at 242–45.) Dr. Goldman is "Board certified,

9    ABPN," or the American Board of Psychiatry and Neurology. (*Id.*) In response to whether "the

10   medical information supports functional limitations[15] from 3/23/12–3/26/12," Dr. Goldman

11   responded "no" and noted the following:

12               It should be pointed out that it is beyond the expertise of this reviewer
                 to establish that this claimant's reported stress was the main cause of
13               his cardiovascular problems, as is recorded by the treating
                 psychologist. From a psychiatric perspective the data suggest
14               complaints of work stress and jobs fit, rather than a globally or
                 functionally impairing mental condition or mental disorder. The
15               claimant['s] anxiety regarding his cardiac status would not be
                 deemed inappropriate or pathological. There is no evidence of active
16               pharmacotherapy and there are no notes from a psychiatrist. There
                 are no[] narrative progress notes from the psychotherapist. There are
17               no serial mental status examinations for review and no data to
                 support loss of global functionality.
18

19   (*Id.* at 244.) Dr. Goldman also suggested Plaintiff "undergo a psychiatric assessment to ascertain

20   the possibility of more aggressive treatment with psychotropic medications," but answered in the

21   negative in response to whether "the medical information support[s] functional limitations related

22   to the effects of medications." (*Id.*) In an addendum dated August 14, 2012, Dr. Goldman noted

23   that he spoke with Dr. Stratigakes on August 9, 2012. (*Id.* at 237.) Dr. Stratigakes reported that

24   Plaintiff "was globally functional" and "was grossly cognitively intact and had no suicidal

25   ideation or thought disorder but with more hopelessness." (*Id.*) Dr. Goldman noted the

26   following: "My opinion remains unchanged . . . While understandably stressed, [Plaintiff] is

27   ───────────────

28   [15]     "Functional limitations include any reduction [of] inability to work full-time." (*Id.* at 244.)

26

1   suggested to have been active globally, with no cognitive impairment or significant dysfunction

2   in attention to personal grooming and hygiene.  There was no evidence of a vegetative depression

3   or a thought disorder."

4          37.    After MetLife sent the IPC reports to Drs. Stratigakes and Marquardt (i*d.* at 221,

5   223), they responded in two separate letters.

6          38.    In a letter dated September 18, 2012, Dr. Stratigakes confirmed that he reviewed

7   the reports of the IPCs addressing Plaintiff's psychological functionality from March 23–26,

8   2012.  (*Id.* at 196.)  Dr. Stratigakes noted that "in [his] professional opinion [Plaintiff] was very

9   psychologically and functionally challenged during the period of March 23–26, 2012," and in a

10  session on March 29, 2012, committed to not taking his life despite thoughts of suicide.  (*Id.*)  Dr.

11  Stratigakes noted that Plaintiff "had functional limitations during the period under evaluation and

12  continues to have functional limitations."  (*Id.*)  As Defendants note, Dr. Stratigakes made no

13  mention of any referral to a psychiatrist and/or for cognitive testing, or pharmacology with

14  prescription medications.  (ECF No. 115-1 at 12.)

15         39.    In a letter dated September 26, 2012, Dr. Marquardt confirmed Plaintiff's exercise

16  echocardiography on 1/28/2010 "was negative for myocardial ischemia" and that he "had no

17  episodes of chest discomfort" while taking ranolazine.  (AR 193.)  Dr. Marquardt noted Plaintiff

18  "has been seen by a psychologist who has recommended that [he] should not go back to a high

19  stress occupation such as his previous employment as an engineer."  (*Id.*)  Dr. Marquardt noted

20  Plaintiff "also feels that his short-term memory is declining" and concluded Plaintiff "is unable to

21  return to his previous occupation as an engineer and his chronic fatigue, anxiety, and

22  memory/concentration impairment currently render him unable to sustain regular paid

23  employment."  (*Id.*)

24         40.    Defendants argue Plaintiff's subjective complaints of pain are subject to medical

25  verification and "are not entitled to greater deference than any of the other medical evidence in

26  the record."  (ECF No. 115-1 at 19 (citing *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598

27  F. Supp. 2d 1090, 1097 (C.D. Cal. 2009), *aff'd*, 409 F. App'x 99 (9th Cir. 2010)).)  However,

28  *Seleine* is distinguishable from the instant case in two respects.  First, *Seleine* was decided under

the abuse of discretion standard, not the *de novo* standard that applies here.  It is therefore only helpful to a point.  *Filarsky*, 391 F. Supp. 3d at 941–42 ("the reviewing court evaluated whether the insurer's decision was arbitrary and capricious — not whether the decision was correct.  A reasonable conclusion (one free of arbitrariness and caprice) may in some cases be incorrect; therefore, such cases are helpful only to a point when reviewing [defendant's] denial of coverage.") (internal citations omitted).  Second, the defendant in *Seleine* ordered a number of exams that provided evidence that the plaintiff could perform her work and contradicted the plaintiff's subjective assertion that her pain levels prohibited her from working.  Further, the treating physician's assessments conflicted with the plaintiff's subjective symptoms and there were no objective changes in the plaintiff's condition over the years which would have resulted in a sudden change in pain level and ability.  None of these are true in the instant matter.  Defendants did not order any exams that contradicted Plaintiff's subjective reports of psychological distress nor are Plaintiff's reports inconsistent with his treating physician's assessments.  Further, it would be an abuse of discretion for the Court to fail to consider Plaintiff's subjective account of pain.  *Kibel v. Aetna Life Ins. Co.*, 725 F. App'x 475, 477 (9th Cir. 2018) (citing *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904–07 (9th Cir. 2016)).

41.    The Court has taken into account Plaintiff's subjective accounts of psychological distress post-termination of benefits.  Nevertheless, the Court finds that these accounts, primarily provided in the form of letters from Dr. Stratigakes and Marquardt, as well as the doctors' conclusions therein that Plaintiff should remain disabled, conflict with the doctors' pre-termination conclusion that Plaintiff should no longer be considered disabled.  It is puzzling that both letters failed to explain why Drs. Stratigakes and Marquardt reached contrary conclusions pre- and post-termination of LTD benefits.  Thus, the Court finds that these letters are entitled to little weight.

42.    Based on the foregoing — namely, weight of the evidence in the form of the reports of Drs. Stratigakes and Marquardt pre-termination, Dr. Peters's file review, and the review of the IPCs — the Court finds Plaintiff was no longer psychologically disabled when MetLife terminated his LTD benefits on March 22, 2012.

43. **RTWP Benefits & Liability of Technicolor**: Because the Court finds that Plaintiff was no longer disabled on March 22, 2012, when MetLife terminated benefits, it declines to consider Plaintiff's arguments regarding RTWP benefits and Defendants' arguments regarding the liability of Technicolor.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff was no longer disabled within the meaning of the Plan when MetLife terminated his LTD benefits on March 22, 2012. Accordingly, the Court hereby DENIES Plaintiff's Motion for Judgment (ECF No. 125), GRANTS Defendants' Motion for Judgment (ECF No. 115), and DENIES Plaintiff's Motion for Admission of Extrinsic Evidence (ECF No. 119).  The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

DATED:  February 18, 2022

Troy L. Nunley
United States District Judge